-IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENT PAUL DOLAN, | : | Civil No. 3:14-cv-1436 |
| Plaintiff | : | |
| | : | (Judge Mariani) |
| v. | : | |
| | : | |
| CRAIG LOWE, *et al.*, | : | |
| Defendants | : | |

## MEMORANDUM

On July 25, 2014, Plaintiff, Vincent Paul Dolan, an inmate formerly confined at the

Pike County Correctional Facility ("PCCF"), in Lords Valley, Pennsylvania,[1] filed the instant

action pursuant to 42 U.S.C. § 1983. (Doc. 1). The complaint alleges that while

incarcerated at the PCCF, Dolan was denied freedom to practice his choice of religion in

violation of the First Amendment.[2] (*Id.*). The named Defendants are the following

employees at the PCCF: Craig Lowe, Warden; Robert McLaughlin, Assistant Warden; Erica

Zaleck, Correctional Counselor; Theressa Mooney, Correctional Counselor; and John

Frawley, Sergeant. (*Id.*).

Presently pending before the Court is Defendants' motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56. (Doc. 38). For the reasons set forth below,

the Court will grant Defendants' motion.

---

[1]   Dolan is currently confined at the Retreat State Correctional Institution, Hunlock Creek, Pennsylvania. (Doc. 41).

[2]   Dolan does not allege that Defendants violated his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

## I.   Standard of Review

Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Once such a showing has been made, the non-moving party must go beyond the pleadings with

affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

## II.   Statement of Undisputed Facts

With the above standard of review in mind, the following are the facts material to the

3

present motion, drawing any reasonable inferences in favor of the non-moving party, Dolan.

At all times relevant, Dolan was an inmate at the Pike County Correctional Facility.

(Doc. 39, ¶ 1).

The PCCF has a policy titled "Inmate/Detainee Religious Programs", designated as

Policy 2204. (Doc. 39, ¶ 2; Doc. 39, Ex. A, at 6-7). The Policy states, in relevant part, as

follows:

> Inmates/detainees will identify their religion, as well as any religious
> requirements upon commitment to the facility. General Population
> inmates/detainees may request participation in religious services and/or
> meetings. Inmates/detainees may change their religious designation once
> every 90 days. They must complete the "Religious Accommodation"
> worksheet (Attachment 2204.1) and submit it to the Assistant Warden for
> review. All inmates/detainees who are approved for a religious diet
> accommodation must sign the common far[e] religious diet rules and
> requirements form (S.O.P. 2204.2) and will receive a "Common Fare" meal.
> Inmates/detainees who are not approved for religious change and/or diet
> accommodations may re-apply in ninety (90) days.

(Doc. 39, ¶¶ 3-7; Doc. 39, Ex. A, at 6).

Dolan was previously admitted to the PCCF on March 19, 1996 and December 6,

1996. (*Id.* at ¶ 9). At the time of these prior admissions, Dolan indicated that his religion

was "Christian-Catholic". (Doc. 39, ¶ 10; Doc. 39, Ex. C).

Dolan again arrived at the PCCF on January 28, 2014. (Doc. 39, ¶ 8; Doc. 39, Ex.

B). The intake form indicates that Dolan identified his religion as "Christian-Catholic" and

that Dolan did not request or require a religious or special diet. (Doc. 39, ¶ 11; Doc. 39, Ex.

4

B). Dolan disputes whether he identified his religion as Christian/Catholic. (Doc. 48, at 4).

During the time period of January 29, 2014 through May 30, 2014, Dolan received the regular prison diet and ordered regular food from the commissary. (Doc. 39, ¶ 13; Doc. 39, Exs. C, D). Dolan never attended any Muslim groups or Islamic religious services when housed in the general population. (Doc. 39, ¶ 14; Doc. 39, Exs. C, E). Dolan avers that he was not permitted to attend Islamic services because he was not registered as Muslim. (Doc. 48, at 4). Instead, Dolan attended several Christian/Catholic programs. (Doc. 39, ¶ 15; Doc. 39, Ex. E). Namely, The Book of Romans, Pastor Doug Rhines' Bible study, New Life Bible Study with Bill Bartkow, New Covenant with Vincent Brown, Jehovah Witness Bible Study, Friday Catholic Church with Deacon Joe LaCorte, Faith Christian Outreach, Christian Inspiration, Catholic Bible Talk, and the Bi-Lingual Bible programs. (*Id.*).

At intake, it was also noted that Dolan has a tattoo of rosary beads on his left hand. (Doc. 39, ¶ 16; Doc. 39, Ex. B). Dolan states that he had this tattoo before he changed his religion to Islam. (Doc. 48, at 7).

On February 28, March 3, and April 9, 2014, Dolan submitted inmate request forms stating that he converted to Islam and wanted to receive "common fare" meals. (Doc. 39, ¶ 18; Doc. 39, Ex. F). PCCF officials denied these requests because Dolan was not incarcerated for the requisite ninety (90) days in order to request a change in religious designation, in accordance with PCCF Policy 2204. (Doc. 39, ¶ 19; Doc. 39, Ex. F).

On April 28, 2014, Dolan was at the PCCF for ninety (90) days. (Doc. 39, ¶ 17). On April 27, 2014, Dolan submitted another request to change his religious designation to Islam, and request for "common fare" meals. (Doc. 39, ¶ 20; Doc. 39, Ex. F). On April 29, 2014, and in accordance with PCCF Policy 2204, Dolan was provided with a "Request for Religious Accommodation" form. (Doc. 39, ¶ 21; Doc. 39, Exs. C, F). The form consisted of six (6) questions. (Doc. 39, ¶ 22; Doc. 39, Exs. C, F). Dolan failed to provide an answer to question number one and answered question number two incorrectly. (Id.). The PCCF denied Dolan's request for religious accommodation based on his inability to correctly answer the basic questions on the form. (Doc. 39, ¶ 23; Doc. 39, Ex. C).

From January 28, 2014 to September 24, 2014, PCCF officials issued six (6) misconducts to Dolan. (Doc. 39, ¶ 24; Doc. 39, Ex. G). The PCCF disciplined Dolan for threatening a correctional officer with bodily harm, assaulting another inmate, destroying county property, introducing or transferring contraband within the facility, and interfering with the orderly operation of the facility. (Doc. 39, ¶ 25; Doc. 39, Exs. C, G). On June 25, 2014, Dolan was placed in the Restrictive Housing Unit ("RHU") due to these offenses. (Doc. 39, ¶ 26; Doc. 39, Ex. G).

During Ramadan, fasting begins at dawn and ends at sunset. (Doc. 39, ¶ 32). Dolan claims that he fasted during the day and wanted the PCCF to provide him meals after sunset. (Id.).

6

On June 29, 2014, while housed in RHU, Dolan submitted a written inmate request form to participate in Ramadan. (Doc. 39, ¶ 27; Doc. 39, Ex. F). PCCF officials advised Dolan that, according to PCCF Policy 2204, he could try to change his religious designation ninety (90) days after April 30, 2014. (Doc. 39, ¶ 28; Doc. 39, Ex. F). On June 30, 2014, Dolan submitted a written inmate request to speak with an Imam or another individual certified to oversee the Muslim faith. (Doc. 39, ¶ 29; Doc. 39, Ex. F). PCCF officials approved the request, and advised Dolan to identify the individual he wished to contact. (Doc. 39, ¶ 30; Doc. 39, Ex. F).

On June 30, 2014, Dolan submitted another written inmate request to participate in Ramadan, indicating that he did not have food to assist with his fast. (Doc. 39, ¶ 31; Doc. 39, Ex. F). PCCF officials advised Dolan that prison policy precluded him from receiving a religious diet at that time. (Doc. 39, ¶ 34; Doc. 39, Ex. F). Further, PCCF officials advised Dolan that his disciplinary sanctions and placement in the RHU precluded him from participating in group programs according to Policy 2204. (Doc. 39, ¶ 33; Doc. 39, Exs. C, F). Dolan avers that he did not request to participate in group services. (Doc. 48, at 6).

PCCF Policy 1204.3 provides that commissary items identified as "universal" on the commissary menu are compatible with religions requiring a diet accommodation. (Doc. 39, ¶ 35; Doc. 39, Ex. A). Policy 1204.3 states, in pertinent part, that "inmates/detainees on the common fare diet must not possess or consume "regular commissary", but may consume

7

commissary items identified as "Universal" on the commissary menu (the Universal items are compatible with religions requiring a diet accommodation)." (Doc. 39, Ex. A, at 2). Dolan was entitled to purchase commissary items to aid in his fast as part of Ramadan. (Doc. 39, ¶ 36; Doc. 39, Ex. A). Dolan regularly ordered food items from the commissary. (Doc. 39, ¶ 37; Doc. 39, Ex. D).

On August 4, 2014, Dolan submitted a written inmate request to change his religion to Islam. (Doc. 39, ¶ 38; Doc. 39, Ex. F, at 4). Dolan stated, "I don't need a common fare diet, just to have my religion changed in the computer." (Id.). On August 7, 2014, Dolan again completed the "Request for Religious Accommodation" form, since more than ninety (90) days passed from the date of his earlier denial. (Doc. 39, ¶ 39; Doc. 39, Ex. F, at 5). Dolan answered the first question incorrectly, however PCCF officials nonetheless approved his request, finding that he had displayed a sincere desire to learn aspects of the Muslim faith. (Doc. 39, ¶ 40; Doc. 39, Exs. C, F). Dolan disputes whether he answered question number one incorrectly. (Doc. 48, at 7). The PCCF then changed Dolan's religious designation from Christian/Catholic to Muslim. (Doc. 39, ¶ 41; Doc. 39, Ex. C). The PCCF gave Dolan the option to receive the "common fare" religious diet. (Doc. 39, ¶ 42; Doc. 39, Ex. C). Dolan accepted the "common fare" diet on August 12, 2014. (Id.). Dolan made no further requests to PCCF officials for religious accommodations. (Doc. 39, ¶ 43).

The PCCF grievance process is outlined in Section 21 of the PCCF Inmate

8

Handbook. (Doc. 39, ¶ 45; Doc. 39, Exs. H, I). The PCCF requires inmates to follow the following administrative steps to resolve complaints: (1) informal resolution, (2) written grievance (adjudicated by Grievance Coordinator), (3) Level II and Level III written appeals, and (4) appeal to the Warden. (Doc. 39, ¶ 46; Doc. 39, Ex. I). The record consists of several written grievances related to the facts in the instant complaint. (Doc. 39, ¶ 47; Doc. 39, Ex. F). There is no record of Level II or Level III written appeals, and no record of any appeals to the PCCF Warden. (Doc. 39, ¶ 48; Doc. 39, Ex. H).

## III. Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state

9

law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

## A.   Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA"), as amended 42 U.S.C. § 1997e,

requires prisoners to present their claims through an administrative grievance process

before seeking redress in federal court.  The Act specifically provides, "[n]o action shall be

brought with respect to prison conditions under section 1983 of this title, or any other

Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  An inmate

must comply with the PLRA exhaustion requirement as to any claim that arises in the prison

setting, regardless of the nature of the claim or of the relief sought.  *Porter v. Nussle*, 534

U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001); *Goodwin v.

Zickenfoose*, 2013 WL 5719367, *2 (M.D. Pa. 2013) (Munley, J.).  "[I]t is beyond the power

of ... any ... [court] to excuse compliance with the exhaustion requirement, whether on the

ground of futility, inadequacy or any other basis."  *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir.

2000).  Failure to exhaust administrative remedies is an affirmative defense that must be

pled and proven by the defendant.  *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)

(reasoning that "[p]rison officials are likely to have greater legal expertise and, as important,

superior access to prison administrative records in comparison to prisoners").

Further, the PLRA mandates that an inmate "properly" exhaust administrative

remedies before filing suit in federal court, which demands compliance with an agency's

deadlines and other procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 92 (2006); *Spruill v.

Gillis*, 372 F.3d 218, 230 (3d Cir. 2004) (concluding that the PLRA includes a procedural

default component); *Rivera v. Pa. Dep't of Corr.*, 388 F. App'x 107, 108 (3d Cir. 2010) ("An

inmate must exhaust his administrative remedies *prior* to filing a civil action in federal

court.") (emphasis added).  A procedural default by the prisoner, either through late or

improper filings, bars the prisoner from bringing a claim in federal court unless equitable

considerations warrant review of the claim. *McKinney v. Kelchner*, 2007 U.S. Dist. LEXIS

71958, *8 (M.D. Pa. 2007) (citing *Spruill*, 372 F.3d at 227-32; *Camp v. Brennan*, 219 F.3d

279 (3d Cir. 2000)).

Defendants argue, and Dolan has admitted, that Dolan did not exhaust his available

administrative remedies prior to filing the instant action.  Dolan states that, "Defendants

claim that Plaintiff did not Exhaust His Grievance remmides [sic][,] while this part is true it is

not with out good reason." (Doc. 48, at 10).  In an attempt to excuse the exhaustion

requirement, Dolan argues that he received negative responses to his grievances and he

waited fifteen days to receive a grievance response.  (*Id.*).

It is undisputed that the PCCF has a grievance system available to inmates.  It is

also undisputed that before filing the instant action, Dolan did not exhaust his available

administrative remedies at the PCCF.  Section 21 of the PCCF Inmate Handbook sets forth

11

the grievance process and requires inmates to resolve complaints according to the following

procedure:

    (1)    Informal resolution through verbal communication with the inmate's
           Housing Unit Officer
    (2)    Written grievance, investigated and responded to by the Grievance
           Coordinator
    (3)    Level II and Level III written appeals submitted to the Grievance
           Coordinator and adjudicated by the Grievance Committee, and
    (4)    Appeal to the Warden

(Doc. 39-9, at 47-48).

       The record reveals that Dolan filed grievances related to the facts alleged in the

instant complaint. However, there is no record of any written appeals to Level II or Level III,

and no record of any appeals to the Warden. Thus, this is not a case where Dolan

exhausted all of the steps of the grievance process. Indeed, Dolan admits that he failed to

exhaust the prison grievance procedure. (Doc. 48, at 10). He essentially requests that the

Court excuse his noncompliance with the administrative remedy program. Dolan states that

he "would never be able to resolve this matter before the 30 day period of [R]amadan so He

took alternative measures that would be equal to the process just in a faster time period."

(Doc. 48, at 12). It is evident that Dolan was aware of the exhaustion requirements, but

failed to adhere to the grievance policy. Dolan's failure to attempt compliance with all steps

of the grievance procedure cannot be excused. There is no merit to Dolan's contention that

he should be excused from the mandatory exhaustion requirement because the process

12

was too lengthy. (Doc. 48, at 10-11). Where a grievance procedure is set forth in an inmate handbook, as is the case here, a prisoner is required to avail himself of those administrative remedies in order to satisfy the mandatory exhaustion requirement of the PLRA. *See Concepcion v. Morton*, 306 F.3d 1347, 1354-55 (3d Cir. 2002) (reversing the district court's decision and directing dismissal of state court prisoner's complaint for failure to exhaust administrative remedies pursuant to § 1997e(a) despite the fact that inmate handbook had not been formally adopted by New Jersey Department of Corrections).

Moreover, there is no indication or suggestion that prison officials engaged in any affirmative misconduct such that they obstructed, hindered, delayed or prevented Dolan from pursuing administrative relief. *See Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002) (an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate"); *Nyhuis*, 204 F.3d at 71 (stating that there is no futility exception to the exhaustion requirement under any circumstances).

A party opposing summary judgment must come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. *See Anderson*, 477 U.S. at 250-57; *Matsushita Elec.*, 475 U.S. at

587-89; *see also* FED. R. CIV. P. 56©, (e).  Dolan has failed to meet his burden with respect

to the administrative exhaustion of his claims.  Defendants are therefore entitled to an entry

of summary judgment.

Additionally, and for the following reasons, the Court finds that Dolan's claims are

unlikely to succeed even if administrative remedies had been exhausted.

B.      First Amendment Exercise of Religion

The First Amendment to the Constitution of the United States, made applicable to

the States by the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60

S.Ct. 900, 84 L.Ed. 1213 (1940), provides, *inter alia*, that "Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise thereof . . . "  U.S.

Const. amend. I.  The First Amendment offers protection for a wide variety of expressive

activities.  *See* U.S. Const. amend I.  These rights are lessened, but not extinguished in the

prison context, where legitimate penological interests must be considered in assessing the

constitutionality of official conduct.  *See Turner v. Safley*, 482 U.S. 78, 89 (1987).  Although

prisoners must be afforded "reasonable opportunities" to exercise their religious freedom

guaranteed by the First Amendment, *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972),

imprisonment necessarily results in restrictions on some constitutional rights, including the

First Amendment's right to the free exercise of religion.  *O'Lone v. Shabazz*, 482 U.S. 342,

348-49 (1987).  It is well-established that only those beliefs which are (1) sincerely held, and

14

(2) religious in nature are entitled to constitutional protection. *Wisconsin v. Yoder*, 406 U.S. 205, 215-19 (1972); *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000); *Africa v. Pennsylvania*, 662 F.2d 1025, 1029-30 (3d Cir. 1981) (describing three indicia of religion (1) an attempt to address "fundamental and ultimate questions" involving "deep and imponderable matters"; (2) a comprehensive belief system; and (3) the presence of formal and external signs like clergy and observance of holidays.).

Once a sincerely held religious belief has been demonstrated, an inmate may show that a prison regulation or practice violates the right to free exercise of religion by demonstrating that it violated the "reasonableness test" set forth in *Turner*, 482 U.S. 78, and *O'Lone*, 482 U.S. 349. This test examines the following four factors: (1) whether the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at the cost of less liberty and safety for guards and other prisoners, and the effect on prison resources in general; and (4) whether an alternative exists which would fully accommodate the prisoners' rights at *de minimis* cost to valid penological interests. *Thornburgh v. Abbott*, 490 U.S. 401, 415-18; *Turner*, 482 U.S. at 89-91. "The objective is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity."

15

*DeHart*, 227 F.3d at 59.  However, prison administrators need not choose the least

restrictive means possible in trying to further penological interests, *Thornburgh*, 490 U.S. at

411, and it is the burden of the plaintiff to disprove the validity of a prison regulation or

practice. *Williams v. Morton*, 343 F.3d 212, 217 (2003) (citing *Overton v. Bazzetta*, 539

U.S. 126 (2003)).

Dolan contends that his First Amendment rights were violated when Defendants

interfered with his participation in Ramadan by failing to change his religious designation

from Catholic to Muslim in the computer system, and thus failing to accommodate his

special dietary needs during the Ramadan celebration.  Defendants maintain that the PCCF

Policy regarding religious designations is reasonable given the prison administrators'

penological concerns.  (Doc. 40, at 13-17).

In analyzing the PCCF policy under *Turner*, it must first be determined whether the

portion of the policy that permits inmates to change their religious designation is reasonably

related to a legitimate penological purpose.  Pursuant to Policy 2204, Dolan was permitted

to change his religious designation after ninety (90) days of incarceration, on April 28, 2014,

and every ninety (90) days thereafter.  PCCF officials provided Dolan with the "Request for

Religious Accommodation" form, testing his basic knowledge of Islam.  However, Dolan

failed to provide an answer to question number one and answered question number two

incorrectly.  (Doc. 39, Ex. F, at 11).  PCCF officials therefore denied Dolan's request for

16

religious accommodation based on his inability to correctly answer the basic questions. PCCF officials further noted that Dolan had a tattoo of rosary beads on his hand, and attended only Catholic/Christian groups sessions when he was in general population. Because PCCF officials refused to change Dolan's religious designation from Catholic to Muslim, he claims that he was unable to participate in Ramadan, and that PCCF officials refused to provide him with meals after sundown.

The PCCF Policy is reasonable in its scope in that it permits inmates to change their religious designations based on a sincere change in religious beliefs. Allowing an inmate to change his religious designation merely to participate in religious programs without a sincerely held belief in that religion would wholly frustrate the purpose of the Policy. The Policy requiring inmates to establish a sincerely held religious belief in order to change a religious designation advances the legitimate governmental interest of preserving prison resources and maintaining order.

In evaluating the second *Turner* factor, "courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." *DeHart*, 227 F.3d at 55. The only First Amendment violation of which Dolan complains is that Defendants did not provide him with food after sundown so that he could fast during the daylight hours as part of Ramadan. There is no indication that he was denied other means of practicing his

17

religion such as purchasing food from the commissary and eating that food after sundown. Dolan still had the alternative of exercising his religious beliefs by purchasing "universal" items from the commissary that complied with his dietary restrictions. Although Dolan claims that inmates in the RHU were restricted in the items they may purchase from the commissary, he presents no evidence in support of this claim. (Doc. 48, at 10). Policy 1204.3 states that all "inmates/detainees" may purchase "universal" items from the commissary, and does not differentiate between general population inmates and those in a lockdown unit. (Doc. 39, Ex. A, at 2). The record is devoid of any evidence that Dolan's ability to practice his faith was restricted or that he was prohibited from practicing his religion in any manner.

With respect to the third *Turner* factor, it is clear from the record that the PCCF accommodates religious diet requests. Defendants point out that "if PCCF staff unnecessarily devoted time to specially prepare trays for inmates who did not sincerely hold religious beliefs, the impact on prison administrative resources would be negative. Dolan failed to demonstrate his change of religion from Christianity to Islam was sincere prior to Ramadan. Dolan failed the test meant to indicate his general knowledge of Islam." (Doc. 40, at 16-17). Preparing a special diet for Muslim prisoners is an expense and an administrative and operational task for the prison. It follows that only prisoners who have demonstrated a sincere belief in Islam should be accorded the special meals to which

18

Muslim adherents are entitled and to be served those meals after sundown.

Regarding the fourth factor, as stated in *Turner*, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90 (citing *Block v. Rutherford*, 468 U.S. 576, 587, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). The procedure outlined in Policy 2204 is a reasonable method to allow an inmate to change his religious designation. Dolan has failed to come forward with facts showing that a more reasonable alternative existed by which the sincerity of his conversion to Islam from Christianity could be determined.

C.   Religious Land Use and Institutionalized Persons Act

Although Dolan does not allege that Defendants violated his rights under RLUIPA, the Court will briefly address any potential claims pursuant to the Act. Section 3 of RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see also Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005).

Although Congress intended that RLUIPA be construed "in favor of broad protection

19

of religious exercise," see 42 U.S.C. § 2000cc-3(g), Congress also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723. Congress indicated that in the event an inmate's request for religious accommodation would "become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Id.* at 726.

It is first noted that Dolan cannot recover money damages against Defendants in either their individual or official capacities under RLUIPA. *Sharp v. Johnson*, 669 F.3d 144, 155 (3d Cir. 2012) (RLUIPA does not permit an action against defendants in their individual capacities); *Scott v. Beard*, 2007 WL 3194039, at *1 (3d Cir. 2007) (finding that the RLUIPA claim for money damages against a Pennsylvania state official in his official capacity is barred by the Eleventh Amendment because it is essentially a claim against the state itself). In the event that Dolan lodged a RLUIPA claim against Defendants in their individual or official capacities, Defendants would be entitled to summary judgment.

Dolan also seeks injunctive relief. Under RLUIPA, the plaintiff must initially prove that his religious exercise is grounded in a sincerely held religious belief, and that his religious exercise has been burdened substantially by the challenged conduct. *Washington*

20

v. *Klem*, 497 F.3d 272, 277-78 (3d Cir. 2007). If the plaintiff shows that prison administrators' action or inaction has imposed a substantial burden on the exercise of his religion, the prison administrator must establish that the challenged conduct furthers a compelling governmental interest and that it is the least restrictive means of furthering that interest. *Id.* at 283. In *Holt v. Hobbs*, ___ U.S. ___, 135 S.Ct. 853, 190 L. Ed. 2d 747 (2015), the United States Supreme Court reasoned that RLUIPA "contemplates a 'more focused' inquiry and 'requires [prison officials] to demonstrate that the compelling interest test is satisfied through application of the challenged [policy] 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2779 (2014)). On the record before the Court, there is no genuine issue of material fact as to whether Dolan's religious exercise was burdened substantially by Defendants' refusal to change his religious designation based on his failure to establish a sincere change in religious beliefs.

## IV.   Conclusion

Based on the foregoing, Defendants' motion (Doc. 38) for summary judgment will be granted. Dolan's motion (Doc. 48) to deny summary judgment will be denied. An appropriate Order will issue.

21

Date:  March _____, 2016

Robert D. Mariani
United States District Judge

22